UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| DAVID VANCE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 4:08-CV-1308 (CEJ) |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social | ) | |
| Security, | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration (SSA).

## I.   Procedural History

On September 15, 2004, plaintiff David M. Vance filed an application for a period of disability, disability insurance benefits, and supplemental security income under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, with an alleged onset date of September 1, 2003.  (Tr. 33-35, 75-79).  After plaintiff's application was denied on initial consideration (Tr. 36-40), he requested a hearing before an Administrative Law Judge (ALJ).  (Tr. 31).

The hearing was held on April 12, 2005; plaintiff was present and represented by counsel.  (Tr. 412-21).  The ALJ issued a decision on July 9, 2005.  (Tr. 13).  The Appeals Council granted plaintiff's request for review, and remanded the case for a second hearing.  Id.  The supplemental hearing was held on December 1, 2005, and plaintiff was again represented by counsel.  (Tr. 424-448).  The ALJ issued an unfavorable decision on February 14, 2007.  (Tr. 10-24).  The Appeals Council denied plaintiff's request for review on July 18, 2008.  (Tr. 4-7).  Accordingly, the ALJ's decision stands as the Commissioner's final decision.  See 42 U.S.C. § 405(g).

At the first hearing on April 12, 2005, plaintiff was 36 years old.  (Tr. 413).

Plaintiff testified that he lived with his three children, who were 5, 13, and 17 years

old. (Tr. 412-13).   He had completed seventh or eighth grade, and he had attended

the vocational goodwill assessment program to assess his "educational and training

abilities." .  (Tr. 413, 415, 421).   Plaintiff had worked as a dock worker.   Id.


Plaintiff testified that, because he complained of knee pain, his employer

encouraged him to see a doctor.   (Tr. 413-14).  Then, on January 13, 2004, plaintiff

underwent surgery on both of his knees to repair torn tissue.  (Tr. 414).  Plaintiff

testified that he still experienced knee pain.  Id.  Although he had a cane, plaintiff

"very seldom use[d] it because [he did not] go too many places[.]"  Id.  Plaintiff

explained that it was "too painful for [him] to walk[,] sit, [and] bend[.]"  Id.  Plaintiff

had not pursued physical therapy, but he testified that he did some exercises at home.

(Tr. 415).   Plaintiff stated that he visited his family doctor, Dr. Rashid, every two

months. (Tr. 415).  Plaintiff stated that he could sit for an hour to and hour an a half,

could stand for a half-hour to an hour, and lift no more than fifty pounds.  (Tr. 417-

18).

Plaintiff testified that he had arthritis in his hands.  (Tr. 416).  Plaintiff stated

that he drove a car to the store and to took his five-year-old child to school.  (Tr. 417).

During the day, plaintiff cleaned the house, cooked, and did laundry. (Tr. 417).

Plaintiff testified that he experienced knee pain when he used the stairs.  Id.  Plaintiff

had no hobbies, but he was learning to use his new computer.   Id.

Plaintiff testified that, in August, he visited Dr. Hanaway and complained of

stiffness and pain in his back as well as severe pain in his lower back, and around his

belt line.  (Tr. 418-19).  At Dr. Hanaway's recommendation, plaintiff received a CT scan of his neck, a lumbar spine, and an MRI of his cervical spine a month before the hearing.  (Tr. 418-19, 433).  A week before the hearing, plaintiff visited Dr. Hanaway again.  (Tr. 420, 433).  Dr. Hanaway determined that plaintiff had protruding discs in his lower back.  (Tr. 433).

Plaintiff explained that his knee pain affected his reflexes in his hands and arms. (Tr. 420).  As such, he would unexpectedly drop items when his hand "lock[ed] up [and he got] the shakes[.]"  Id.  Plaintiff experienced "the shakes" occurred twice per day.  Id.

 Plaintiff was 36 years old at the time of the second hearing on December 1, 2005.  (Tr. 425).  Plaintiff stated that he dropped out of school in the eighth grade, and that he had been in regular and special education classes.  Id.  Plaintiff stated that he never received his GED, and that he had a "bad memory."  (Tr. 447).

Plaintiff testified that he was not married, but that he lived with his seventeen-year-old daughter and six-year-old son.  (Tr. 437-38).  Plaintiff  left the house to buy groceries and to attend his son's parent-teacher conferences.  (Tr. 440).  Plaintiff testified that his parents lived down the street, and he visited them on holidays.  (Tr. 441).  Plaintiff only communicated with his siblings during the holidays.  Id.  Plaintiff watched some television and enjoyed reading.  (Tr. 446-47).  Plaintiff's testified that his daughter was teaching him how to use his computer.  Id.

Plaintiff drove his son to school, and his daughter rode "the bus [to school] or her boyfriend picks her up."  (Tr. 438).  Plaintiff testified that, during the day, he cleaned the house and gathered the laundry.  (Tr. 437).  Plaintiff explained that his daughter "[took the laundry] downstairs because . . . [his] knees start[ed to] shak[e]" when he tried to carry things downstairs.  (Tr. 437).

Plaintiff last worked on September 1, 2003. (Tr. 426). For nine or ten years, he worked for Blake Floor Company ("BFC") and similar companies, installing, sanding, and refinishing hardwood floors. Id. At some point, plaintiff's supervisor at BFC told him that "he didn't need [him] anymore." (Tr. 427). Before he worked for BFC, plaintiff repaired boats for President Casino. (Tr. 427).

At the time of the supplemental hearing, plaintiff testified that he was not taking any medication. (Tr. 442). Plaintiff stated that he had recently started receiving Medicaid. Id.

While working at BFC, plaintiff stated that he experienced knee pain. (Tr. 428). Plaintiff went to the hospital for x-rays. Id. Later, BFC's medical doctor examined his knees and determined that he had torn ligaments, and referred him to Dr. Mannis for knee surgery. (Tr. 428). Plaintiff testified that his back, neck, and elbow problems kept him from working. (Tr. 429). Plaintiff explained that these problems began after September 2003. Id.

Plaintiff testified that Dr. Mannis, a surgeon, performed surgery on both of his knees. (Tr. 14, 429-31). Before and after his knee surgery, plaintiff underwent physical therapy. Id. Plaintiff testified that his physical ailments did not begin until after his knee surgery. (Tr. 430). Plaintiff also stated that he was involved in a car accident on his way to the supplemental hearing. (Tr. 432). Two days after his knee surgery, plaintiff fell in his kitchen. (Tr. 429, 442). Plaintiff injured his head, elbow, and legs, but he testified that he only had his elbow examined. (Tr. 442-43).

Plaintiff testified that his physical conditions made "[i]t . . . almost impossible for [him] to do a lot of activities." (Tr. 434). Plaintiff experienced the most pain "[f]rom the neck down." (Tr. 434). Plaintiff, accompanied by either his son or daughter, drove to the grocery store. (Tr. 439). Plaintiff testified that he can only

shop in the grocery store for a half an hour before the pain in his feet, heels, knees, and back escalated. (Tr. 435). After a half an hour, plaintiff explained that he has to sit down because of the pain in his heels and back. Id. The pain had once caused him to fall. Id. Plaintiff could lift a gallon of milk and a twenty-five pound bag of dog food, and could carry two grocery bags that contained canned goods and meat. (Tr. 436-37). Plaintiff testified that his knee, neck, and back pain prevented him from driving long distances. (Tr. 439). Plaintiff could not sit for "very long" because he experienced knee and lower back pain. (Tr. 440). Plaintiff explained that his most comfortable position was "[s]itting back and . . . keeping [his] body in a straightened position." (Tr. 446).

Plaintiff testified that he received shoe inserts to support his heels. (Tr. 443). Plaintiff elevated his legs to relieve his knee pain. (Tr. 444). Plaintiff testified that he had not received worker's compensation in over a year, and that he had a pending worker's compensation suit. (Tr. 445-46).

### III. Medical Evidence

On September 1, 2003, plaintiff complained of pain in both of his knees. (Tr. 221). Charles I. Mannis, M.D., noted that plaintiff had been "seen by a doctor at St. Anthony's, x-rays were taken and he was placed on [Q]uinine,[1] Vicodin,[2] Vioxx,[3] and

---

[1]Quinine is used to treat "pain and cramps in lower body, legs, feet and toes with accompanying sleeplessness and disrupted sleep." See Phys. Desk Ref. 3315 (64th ed. 2010).

[2]Vicodin is "indicated for the relief of moderate to moderately severe pain." See Phys. Desk Ref. 560 (64th ed. 2010).

[3]Vioxx is the "trademark for a preparation of rofecoxib[,]" which is "a nonsteroidal antiinflammatory drug of the COX-2 inhibitors group, used in treatment of osteoarthritis, acute pain, and dysmenorrhea; [and is] administered orally." See Dorland's Illustrated Med. Dict. 2086, 1677 (31st ed. 2007).

muscle relaxants.  Id.  Dr. Mannis determined that plaintiff suffered from bilateral knee pain.  Id.

Plaintiff visited the emergency room at St. Anthony's Medical Center on September 8, 2003, complaining of knee pain.  (Tr. 286-87).  On October 22, 2003, Dr. Mannis noted that he found "no significant tenderness . . . to the palpation of [plaintiff's] knees." (Tr. 220).  As such, Dr. Mannis stated that plaintiff could "return to his ususal occupational duties as of October 27, 2003."  Id.

In his notes dated November 26, 2003, Dr. Mannis wrote that, although plaintiff had been "released to work after the last examination, [plaintiff had] been laid off and [was] not working." (Tr. 219).   Plaintiff complained of "aching and soreness in both knees[,] particularly[when] he [sat] with his knees bent for any period of time." (Tr. 219).  Dr. Mannis diagnosed plaintiff with tendonitis[4] and chondromalacia[5] in both knees.  Dr. Mannis recommended that plaintiff apply ice to his knees and receive "a steroid injection into the knee [to] alleviate the inflammatory process[.]"  Id.  Dr. Mannis noted that plaintiff's "left knee was injected with 1 cc of Kenalog[6] and 1 cc of Nesacaine."[7]  Id.

---

[4]Tendonitis is a synonym for tenontitis, which refers to the "[i]nflammation of [the] Tenon capsule or the connective tissue within Tenon space." See PDR Med. Dict. 1945-46 (3d ed. 2006).

[5]Chondromalacia is the "softening of any cartilage." See PDR Med. Dict. 369 (3d ed. 2006).

[6]Kenalog is the "trademark for preparation of triamcinolone acetonide[,]" which is "an ester of triamcinolone; applied topically to the skin or oral mucosa as an antiinflammatory[.]"  See Dorland's Illustrated Med. Dict. 992, 1986 (31st ed. 2007).

[7]Nesacaine is the "trademark for preparations of chlorocprocaine hydrochloride[,]" which is "a local anesthetic used in minor and general surgery for infiltration anesthesia, field block, Bier block, regional nerve block, and caudal and lumbar epidural anesthesia[.]" See Dorland's Illustrated Med. Dict. 1280, 352 (31st ed. 2007).

On December 23, 2003, John P. Crotty, M.D., conducted an MRI scan of plaintiff's left knee.  (Tr. 223).  "There [was] a minimal joint effusion and no popliteal cyst."  Id.  Dr. Crotty "[did] not see narrow edema or evidence for a marrow-replacing process."  Id.  Dr. Crotty noted minimal joint effusion and Grade II signal posterior horn medial meniscus.  Id.  A week later, Dr. Mannis examined plaintiff and opined that he suffered from (1) a medial meniscus tear in his right knee; (2) a possible medial meniscus tear in his left knee; and (3) and probable chondromalacia in both of his knees.  (Tr. 217).  Dr. Mannis recommended that plaintiff undergo arthroscopic knee surgery.  Id.

On January 9 and 13, 2004, plaintiff was admitted to Missouri Baptist Medical Center complaining of bilateral knee pain.  (Tr. 298-300).  On January 12, 2004, Dr. Mannis performed chondroplasty[8] on plaintiff's (1) right knee patella and medial femoral condyle as well as his lateral femoral condyle,[9] and (2) left knee patella and medial femoral condyle.  (Tr. 224).  In an operative note dated January 13, 2004, Dr. Mannis reported the following findings:

> No meniscal pathology.  However, very soft.  Chondroplasty of the patella and medial femoral condyle of the left knee performed.  Chondroplasty of the medial lateral femoral condyles and patella of the right knee performed.  No subcondral bone was exposed.  Firm cartilage was residual after debridement.  The patient tolerated the procedure well.

(Tr. 216).  Plaintiff received a prescription for Viodin-ES[10] and Toradol.[11]  Id.

---

[8]Chondroplasty refers to the "reparative surgery of cartilage."  See PDR Med. Dict. 369 (3d ed. 2006).

[9]A condyle is "[a] rounded articular surface at the extremity of a bone."  See PDR Med. Dict. 428 (3d ed. 2006).

[10]Vicodin-ES tablets are "indicated for the relief of moderate to moderately severe pain."  See Phys. Desk Ref. 562 (64th ed. 2010).

[11]Toradol is "a trademark for preparation of ketorolac tromethamine[,]" which is "a nonsteroidal antiinflammatory drug administered intramuscularly, intravenously, or

On February 2, 2004, plaintiff was admitted to the emergency room at St. Anthony's Medical Center because he had fallen on January 15, 2005 and landed on his left elbow. (Tr. 276, 280). On February 4, 2004, Dr. Mannis examined plaintiff and recommended "a structured physical therapy program three days a week for the next three weeks to decrease [the] pain and [to] improve function." (Tr. 214).

On February 25, 2004, Dr. Mannis noted that plaintiff complained of some knee pain and popping, attended therapy regularly, and had noticed "minimal improvement." (Tr. 212). Dr. Mannis indicated that plaintiff was taking "Ambien 10 mg #30[,]" and determined that plaintiff could "work only in an essentially sedentary capacity, if available." (Tr. 212).

On March 2, 2004, Dr. Mannis examined plaintiff and completed a Work Hardening Evaluation. (Tr. 208). Plaintiff complained of "a constant ache and pain in both knees, [and] report[ed] pain [in] both [the] anterior and posterior [portion of his] knees, and . . . in [the] bottom of both [of his] heels." Id. Plaintiff rated his pain a 5 on a scale from 0 to 10. (Tr. 208). Dr. Mannis noted that plaintiff "displayed . . . only fair balance" and experienced dizziness. (Tr. 210). Plaintiff's medications included Vioxx and Vicodin, and his aggravating factors included "being upon his feet for [a] prolonged time, bending his knees, squatting and kneeling." Id. At the time of the examination, plaintiff was employed by BFC. Id.

On March 10, 2004, Dr. Mannis noted that plaintiff "was to begin a structured work conditioning program." (Tr. 206). Plaintiff complained of the "loss of feeling in his lower legs when he showered several days ago." Id. Upon examination, Dr. Mannis noted that:

---

orally for short-term management of pain[.]" See Dorland's Illustrated Med. Dict. 1966, 998 (31st ed. 2007).

> [T]here [was] no definite limp. Each knee exhibit[ed] well-healed portals with no soft tissue swelling. [Plaintiff had] diffuse posterior tenderness bilaterally and mild anterior tenderness of the left knee. Quad tone [was] improving.
>
> There [was] mild tenderness to palpation over the plantar aspect of each heel. No other obvious findings [were] noted.

(Tr. 206). Dr. Mannis diagnosed plaintiff with "heel spur syndrome[, which was possibly] due to his gait pattern following [his knee] surgery." Id. As such, Dr. Mannis recommended heel cups and advised plaintiff to use knee braces as needed." (Tr. 206). Dr. Mannis suggested that plaintiff "continue [to participate] in the work conditioning program," use ice, and "[r]emain off work as there is apparently no light duty." (Tr. 206-7). Plaintiff's medications included "Vioxx 25 to 50 mg daily, [and] Vicodin-ES." (Tr. 207).

On March 31, 2004, Dr. Mannis examined plaintiff and noted that his gait was normal, and that both knees "exhibit[ed a] full range of motion without effusion or soft tissue swelling." (Tr. 204). Dr. Mannis diagnosed plaintiff with chondromalacia medial patella and femoral condyles in both knees. Id. Dr. Mannis suggested that plaintiff avoid "repetitive squatting and kneeling [and] continue [his] home exercise and use of heel cups." (Tr. 204). Dr. Mannis also determined that plaintiff could "return to work with appropriate restrictions as mentioned." Id. Then, on April 2, 2004, Dr. Mannis determined that plaintiff suffered from osteoarthritis and degenerative joint disease. (Tr. 171-73).

Treatment notes dated April 2, 2004, May 12, 2004, and June 6, 2004 show that plaintiff complained of neck and back pain, suffered from osteoarthritis and

degenerative joint disease, and was prescribed Vicodin and Neurontin.[12]  (Tr. 168,170, 191-92).

On June 15, 2004, Richard Johnston, M.D., examined plaintiff.  (Tr. 197-99). Dr. Johnston determined that, "[g]iven [plaintiff's] hyperreflexia[,][13] clonus[14] and complaints of cramping in the legs, [his] symptoms may be due to an underlying undiagnosed neuromuscular problem." (Tr. 199).  He recommended that plaintiff (1) see a neurologist or a specialist; and (2) follow Dr. Mannis's recommendation of avoiding repetitive kneeing, squatting, and bending.  Id.

In a letter dated July 1, 2004, Dr. Johnston reiterated that:

[Plaintiff] may have [had] undiagnosed neuromuscular problems in his legs. While this [condition] would have to be fully evaluated by the appropriate specialist, he [thought] it [was] unlikely that such a condition would be work related.

In his opinion, [plaintiff had] partial permanent impairment at the level of his knees related to his knee surgery.  In [his] opinion, [plaintiff had] partial permanent impairment at the level of both knees of 5% due to the bilateral knee arthroscopies.  [Plaintiff] may have [had] partial permanent impairment due to an underlying neuromuscular disorder, but [Dr. Johnston stated] that [he could not] be determined at [that] time.

(Tr. 196).

Treatment notes dated August 18, 2004 indicate that plaintiff complained of neck and back pain, suffered from osteoarthritis and degenerative joint disease, and was again prescribed Vicodin and Nuerotin.  (Tr. 187-89).

---

[12]Neurontin is the "trademark for preparations of gabapentin[,]" which is "an anticonvulsant that is a structural analog of γ-aminobutyric (GABA), used as adjunctive therapy in the treatment of partial seizures; [and is] administered orally." See Dorland's Illustrated Med. Dict. 1287, 764 (31st ed. 2007).

[13]Hyperflexion refers to "flexion of a limb or part beyond the normal limit." See PDR Med. Dict. 920 (3d ed. 2006).

[14]Clonus is "[a] form of movement marked by contractions and relaxations of a muscle, occurring in rapid succession seen with, among other conditions spasticity and some seizure disorders." See PDR Med. Dict. 393 (3d ed. 2006).

- 10 -

On August 24, 2004, Joseph Hanaway, M.D., a neurologist, examined plaintiff. (Tr. 183-85). In addition to summarizing plaintiff's medical history, Dr. Hanaway reported that, "[i]n early 1990, [plaintiff] was in a rear-end motor vehicle collision and had developed neck pain but did not seek any medical care." (Tr. 183). Upon examination of plaintiff's knees, Dr. Hanaway determined that plaintiff had "full range of motion of both knees," his "[m]otor function, muscle bulk, tone, and strength [were] normal in the upper and lower extremities," and there was "no tenderness around the heel or any kind of pressure or ankle joint movement in the heels themselves." (Tr. 184). The "[s]ensory examination reveal[ed] no lateralized or localized sensory impairment in [plaintiff]'s arms or legs." (Tr. 184). Dr. Hanaway made the following clinical impression:

> This patient has an extraordinary story of working as a floor installer and gradually developing wear and tear symptoms of his knees, which demonstrated to be chondromalacia diagnosed with arthroscopic surgery in the beginning of 2004. The patient has no die why he continues to have knee pain. The patient has a chronic lumbar pain, which is referred to the heels, in [his] opinion. The patient does not appear to have any primary heel pathology, such as heel spurs, but there is no definite diagnosis here. The patient also has hyperactive reflexes in the arms, which would suggest that the patient has something wrong with his neck, and this may have occurred because of the whiplash injury the patient experienced 15 years ago.

(Tr. 184). Dr. Hanaway also determined that plaintiff needed "a MRI scan of [his] cervical spine to determine the degree of cord compression[,]" and "a CT scan of [his] lumbar spine to really determine [plaintiff]'s disc condition." (Tr. 185).

On October 28, 2004, the South County office of MERS/Missouri Goodwill Industries evaluated plaintiff and completed a Vocational Evaluation Report. (Tr. 174-82). Plaintiff explained "that he did not wish to pursue employment at [that] time due to being unsure of [his] health and worker's comp[ensation] status." (Tr. 174). Beth Brown evaluated plaintiff and concluded as follows:

> [Plaintiff] could be difficult to work with at times, and became frustrated with the testing on several occasions. At intake, he was visibly frustrated with his prospects, and stated he would not take a job paying less than $13.75/hour. . . .
>
> [He] is very limited at this time with what he would be able to pursue. His lack of [a] GED and lack of [the] ability to obtain one in a short period of time, coupled with his physical limitations, pain, and family obligations will make finding and keeping a job a challenge. Davis is best suited to sedentary employment, but cannot do a driving job due to foot and knee problems as well as due to medications he takes, and would have difficulty with on-going assembly work due to arthritis/pain in [his] hands. One area that is a possibility is sedentary security work.

(Tr. 175).

On November 5, 2004, Judith A. McGee, Ph.D., evaluated plaintiff and completed a Psychiatric Review Technique form. (Tr. 94-107). Dr. McGee found no medically determinable impairment. (Tr. 94). Plaintiff complained of being stressed and depressed; however, Dr. McGee noted that plaintiff had not mentioned these conditions to his other doctors. (Tr. 106). Additionally, Dr. McGee determined that plaintiff's stressors included his family issues and physical problems, and that plaintiff took "narcotic pain medication and something [else] to help him sleep[.]" Id. Plaintiff stated that the medications "affect[ed] his focus and concentration." Id.

On January 11, 2005, U. R. Rodriguez, M.D., examined plaintiff and determined that plaintiff suffered from degenerative joint disease and chronic bronchitis. (Tr. 161). Nine days later, Mark, Halstead, M.D., examined plaintiff at Washington University Medical Center. (Tr. 153-54). Plaintiff complained of "a rubbing sensation [and] pain [in] the posterior part of his knee bilaterally," and stated that he took "Vioxx, Vicodin, and ibuprofen without significant relief." (Tr. 153). Upon examination, Dr. Halstead concluded that:

> [Plaintiff] is well[,] appearing in no distress. He has full range of motion of both knees without pain. He has tenderness localized over his medial and lateral patella facets bilaterally. There is no effusion or soft tissue

swelling.  Ligamentously[,] he is stable.  He has significant patellofemoral crepitus and a positive test bilaterally.  There is no J tracking. McMurray's is negative.  He has tight hamstrings and quadriceps. Neurovascularly, he is intact. . . . Evaluation of his heels and ankle reveal full range of motion although some tightness.  He has tenderness to palpation at the plantar fascia insertion bilateral although this is mild.

My impression is that Mr. Vance has bilateral patellofemoral pain related to some chondromalacia as well as bilateral plantar fasciitis.

(Tr. 153-54).  Dr. Halstead recommended plaintiff modify his physical therapy to focus on stretching.  (Tr. 154).  Dr. Halstead also explained that, given plaintiff's arthroscopy results and "significant chondromalacia," it would be difficult for plaintiff "to get completely well[.]"  (Tr. 154).

In a letter dated April 6, 2005, Dr. Hanaway noted that plaintiff complained of (1) intense pain near the belt line down to his legs; (2) inability to walk because of his knee pain; and (3) neck pain and stiffness.  (Tr. 151).  Upon physical examination, Dr. Hanaway determined that:

There [was] no spasm in the neck, but there [was] tenderness at the base over the midline, over the C7 spine and there [was] definite decreased range of motion from side to side to less than 45 degrees. Low[er] back [was] flattened.  There [was] moderate spasm in the lower lumbar region. [Plaintiff could] bend forward 45 degrees, back bend and side bend 10 degrees limited by his complaints.  Straight leg raising [was] negative on both sides.  Reflexes [were] all hyperactive, 3+ at the wrists, biceps and triceps.  There [were] bilateral Hoffmann's signs.  Reflexes [were] 4+ at the knees, 3+ at the ankles and there [were] two beats of clonus.  There [was] no increased tone.

(Tr. 151).  Dr. Hanaway also reported that plaintiff "continued to have chronic complaints in the neck and low[er] back without definite diagnosis[,]" and that "he [had] a herniated disk in his neck because he [had] hyperactive reflexes indicating cord compression."  Id.   Dr. Hanaway suggested "an MRI of [plaintiff's] cervical spine and a spiral CT scan from L1 to S1 of the lumbar spine[.]"  Id.

In a letter dated May 6, 2005, Samuel Bernstein, Ph.D., assessed plaintiff and completed a psychological and vocational evaluation. (Tr. 392-97). Dr. Bernstein noted that, after plaintiff's ex-wife committed suicide, he visited Dr. Mohinder Partap, a psychiatrist, for approximately six months. (Tr. 392). Plaintiff "stopped seeing Dr. Partrap[,] but he continue[d] to have some symptoms although his depressive symptoms, anxiety, and anger [were] not as severe as they were immediately following the death of his ex-wife." Id. Plaintiff "scored within the severe range on both the Beck Anxiety Inventory and Hamilton Depression Inventory[, and within] the low average range of intellectual functioning of the Revised Beta Examination ("BETA II")." (Tr. 396). Upon examination, Dr. Bernstein determined that:

> [Plaintiff] obviously still [had] a lot of issues with anger as well as depressive symptoms, and he [had] a lot of generalized anxiety because of the doubt surrounding his future and the changes in his life. [Dr. Bernstein] recommended that he seek treatment for his psychological issues[.] . . .

> [Plaintiff] continue[d] to suffer residuals in the way of ongoing pain, popping, and swelling and [had] to elevate his legs throughout the day and [was] on pain medication. He [had] a problem in terms of exertional activities such as sitting, standing, and lifting that would affect all [of his] work activities. Additionally, . . . he [was] developing a cervical problem and back pain with pain shooting down both [of his] legs. He also [had] emphysema.

> [Plaintiff was] still dealing with anger issues and depressive symptoms, but more importantly, he [had] a lot of anxiety for which he will be seeking treatment.

(Tr. 393, 396). Based on plaintiff's extremely limited exertional activities, limited education, and work experience, Dr. Bernstein concluded that plaintiff was "unemployable in the open labor market," and that he "would have difficulty with concentration, persistency[,] pace, maintaining regular attendance, and completing a normal work day." (Tr. 397).

On August 29, 2006, Jack C. Tippett, M.D., saw plaintiff and completed a consultative orthopedic evaluation. (Tr. 380-90). Dr. Tippett reviewed Dr. Bernstein's psychological evaluation. (Tr. 380). He noted that plaintiff could "dress and undress himself [and] get on and off the examining table unassisted." (Tr. 381). Additionally, Dr. Tippett determined that "both [of plaintiff's] knees [were] stable with no evidence of ligamentous laxity [and] full range of motion." Id. Dr. Tippett also noticed that plaintiff's "knees [were] slightly puffy in appearance and mildly tender." Id. As such, Dr. Tippett diagnosed plaintiff with chronic strain on his knees as well as chronic neck and lower back strains. (Tr. 381).

In a Medical Source Statement dated August 29, 2006, Dr. Tippett reported that plaintiff could lift and/or carry 25 pounds occasionally and 20 pounds frequently, could stand and/or walk for about 6 hours in an 8-hour workday, and exhibited limitations in his lower extremities. (Tr. 385-86). Dr. Tippett's examination revealed that plaintiff could occasionally climb, balance, kneel, crouch, crawl, and stoop, and that he exhibited no manipulative, visual, communicative, or environmental limitations. (Tr. 386-88).

On August 31, 2006, Michael T. Armour, Ph.D., examined plaintiff and completed a consultative psychological evaluation. (Tr. 369-74). Plaintiff reported that he had not earned his GED, and that "his reading was 'not that good' in school but . . . he [could] read and understand the average newspaper story." (Tr. 370). Additionally, plaintiff stated that he had worked at BFC for 19 years, and that "he [got] along 'real good' with his supervisors and 'great' with his coworkers." Id. Although plaintiff reported having poor memory, Dr. Armour noted that plaintiff "was able to give a detailed social history which appeared to be internally consistent." (Tr. 373). Plaintiff "stated that he currently was not on any medications." (Tr. 371). Dr. Armour

diagnosed plaintiff with depressive disorder, alcohol dependency by history, and pain disorder due to his physical conditions. (Tr. 373). Dr. Armour noted that plaintiff obtained a Global Assessment of Functioning (GAF)[15] score of 55,[16] and that he exhibited a mild to occasionally moderate impairment in his ability to understand and recall instructions and to sustain concentration and persistence in tasks. (Tr. 373-74). Dr. Armour's observations indicated that plaintiff "suffer[ed] little or no impairment in his ability to interact socially due to his psychological symptoms." (Tr. 374).

Additionally, plaintiff completed a Minnesota Multiphasic Personality Inventory test (MMPI-2) with Dr. Armour. (Tr. 372-79). Plaintiff obtained a "'conversion v' profile" on the MMPI-2. (Tr. 372). Dr. Armour stated that "[i]ndividuals with this type of profile have strong needs to interpret their psychological or interpersonal problems in socially acceptable ways, . . . are typically preoccupied with numerous physical problems, with pain being the most common complaint[, and] tend to rely heavily on the psychological defenses of repression and denial." (Tr. 372). Dr. Armour also noted plaintiff's "score pattern [did] not mean that he does not have an underlying physiological basis for his complaints of pain; rather, [he was] preoccupied with his pain and his perception of how his pain limits his abilities to deal with everyday situations." Id.

On September 20, 2006, Dr. Armour examined plaintiff and completed a Medical Source Statement checklist. (Tr. 366-68). Dr. Armour determined that plaintiff had

---

[15]The GAF is determined on a scale of 1 to 100 and reflects the clinician's judgment of an individual's overall level of functioning, taking into consideration psychological, social, and occupational functioning. Impairment in functioning due to physical or environmental limitations are considered. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 32-33 (4th ed. 2000).

[16]A GAF of 51 to 60 corresponds with "moderate symptoms OR moderate difficulty in social, occupational, or school functioning." Id. at 34.

no restrictions in the areas of understanding, remembering, and carrying out short, simple instructions, interacting appropriately with the public, his supervisor, co-workers, or responding appropriately to work pressures in a usual work setting and changes in a routine work setting, and that he only had "slight" restrictions with understanding, remembering, and carrying out detailed instructions and making judgments on simple work-related decisions.  (Tr. 366).

## IV.  The ALJ's Decision

Administrative Law Judge Julian Cosentino presided at plaintiff's supplemental administrative hearing, and made the following findings:

1. The claimant met the disability insured status requirements of the Act on September 1, 2003, the date the claimant stated he became unable to work, and continues to meet them through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since September 1, 2003.

3. The medical evidence establishes that the claimant has residuals after bilateral arthroscopic knee surgery and chronic back strain, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's allegations of impairment-related limitations are only credible to the extent of the residual functional capacity found herein.

5. The claimant has the residual functional capacity to perform work involving lifting/carrying up to 10 pounds, standing/walking for up to 2 hours in an 8-hour workday and sitting for up to 6 hours in an 8-hour workday (20 CFR 404.1545 and 416.945).  He has additional nonexertional limitations in that he could only occasionally climb, balance, kneel, crouch, crawl, and stoop.

6. The claimant is unable to perform any of his past relevant work.

7. The claimant has the residual functional capacity to perform the full range of sedentary work (20 CFR 404.1567 and 416.967).

8.    The claimant is 37 years old, which is defined as a younger individual (20 C.F.R. 404.1563 and 416.963).

9.    The claimant has a limited education (20 CFR 404.1564 and 416.964).

10.   In view of the claimant's age and residual functional capacity, the issue of transferability of work skills is not material.

11.   Section 404.1569 of Regulations No. 4 and section 416.969 of Regulations No. 16 and Rule 201.25, Table No. 1 of Appendix 2, Subpart P, Regulations No. 4, direct a conclusion that, considering the claimant's residual functional capacity, age, education, and work experience, he is not disabled.

12.   The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 23).

## V.    Discussion

To be eligible for disability insurance benefits, plaintiff must prove that he is disabled.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2000).  An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings."  Nimick v. Sec'y of Health and Human Services. 887 F.2d 864 (8th Cir. 1989).  The ALJ first

determines whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, he is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled. Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, he is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform his past relevant work. If the claimant can, he is not disabled. Fifth, if the claimant cannot perform his past relevant work, the ALJ determines whether he is capable of performing any other work in the national economy. If the claimant is not, he is disabled. See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

### A.     Standard of Review

The Court must affirm the Commissioner's decision, if the decision "is supported by substantial evidence on the record as a whole." Gladden v. Callahan, 139 F.3d 1219, 1222 (8th Cir. 1998), quoting Smith v. Schweiker, 728 F.2d 1158, 1161 (8th Cir. 1984). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002), quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). To determine whether the Commissioner's decision is supported by substantial evidence, the Court "must take into account whatever in the record detracts from its weight." Gladden, 139 F.3d at 1222, quoting Smith v. Schweiker, 728 F.2d at 1162. The Court may not reverse merely because the evidence could support a contrary outcome. Estes, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1.      The ALJ's credibility findings;

2.      the plaintiff's vocational factors;

3.      the medical evidence;

4.      the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

5.      third-party corroboration of the plaintiff's impairments; and

6.      when required, VE testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See Stewart v. Sec'y of Health & Human Services., 957 F.2d 581, 585-86 (8th Cir. 1992).

The Court must consider any evidence that detracts from the Commissioner's decision.  Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999).  Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence.  Pearsall, 274 F.3d at 1217, citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

B.      **Plaintiff's Allegations of Error**

Plaintiff asserts that the ALJ failed to properly consider his residual functional capacity (RFC).  Plaintiff also claims that the ALJ erred in relying on the Medical-Vocational Guidelines (the "grids"),[17] arguing that he suffered from nonexertional

---

[17]The SSA developed the grids.  Hunt v. Heckler, 748 F.2d 478, 480 (8th Cir. 1984) (citations omitted).  "These guidelines contain tables called 'grids' which contain various combinations of RFC's and other criterion.  The grids are used by the [SSA] to determine whether a claimant is disabled."  Id. See also 20 C.F.R. Pt. 404, Subpt. P. App. 2.

impairments of pain depression, and anxiety, which required the ALJ to consider the testimony of a vocational expert.

### 1.    The ALJ's Residual Functional Capacity Determination

The RFC is the most that a claimant can do despite physical or mental limitations. Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); § 404.1545. It is the claimant's burden, rather than the Commissioner's, to prove the claimant's RFC. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). It is the ALJ's responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own description of his limitations. Id. Ultimately, however, the determination of residual functional capacity is a medical issue, Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000), which requires the consideration of supporting evidence from a medical professional, Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

The Court begins with plaintiff's argument that the ALJ erred by finding that he suffered from no mental impairments. (Doc. #19, at 15). First, the ALJ noted that plaintiff "did not allege that he had any mental impairment at the time he filed his disability applications." (Tr. 20). Moreover, at the first administrative hearing, plaintiff did not state that he suffered from anxiety or depression. (Tr. 412-21). Plaintiff only mentioned that he had a "bad memory" at the supplemental hearing. (Tr. 447).

The ALJ properly discounted the opinion of the consulting psychologist, Dr. Bernstein, who determined that plaintiff "had depressive symptoms, as well as 'a lot of' generalized anxiety." (Tr. 20). In his report dated May 6, 2005, Dr. Bernstein opined that plaintiff "continue[d] to suffer residuals in the way of ongoing pain, popping, and swelling and [had] to elevate his legs throughout the day and [was still] on pain medication." (Tr. 396). Based on plaintiff's limited exertional activities, limited

education, and work experience, Dr. Bernstein found that plaintiff was "unemployable in the open labor market." (Tr. 397). According to the ALJ, Dr. Bernstein's psychological "opinion . . . appeared to be based more on [plaintiff]'s subject report of physical limitations, [rather] than . . . on mental health-related limitations." (Tr. 21). The ALJ noted that Dr. Bernstein's diagnosis was based on "a single visit," and that the record indicates that Dr. Bernstein did not "review[ plaintiff's] other records to draw [his] conclusion[s]." (Tr. 20).

The ALJ also considered the consultative opinion of Dr. Armour, a psychologist, who examined plaintiff on August 31, 2006 and September 20, 2006. (Tr. 21). In his report, Dr. Armour noted that plaintiff could read "the average newspaper story" and "[got] along 'real good' with his supervisors and 'great' with his coworkers." (Tr. 370). Although plaintiff obtained a GAF score of 55, (Tr. 373), Dr. Armour opined that plaintiff had a slight impairment in his ability to understand, remember, and carry out detailed instructions and to make judgments on simple work-related decisions; and he had no impairment in his ability to understand, remember, and execute short, simple instructions, interact appropriately with the public, his supervisors, co-workers, or respond appropriately to work pressures in a usual work setting and changes in a routine work environment. (Tr. 366). As such, the ALJ correctly noted that Dr. Armour "assessed [plaintiff] with mild to occasional limitations in his ability to sustain concentration and persistence in tasks due to psychological symptoms[,]" and "opined that [plaintiff] had little or no impairment in his ability to interact socially." (Tr. 21, 366-68, 373-74). Thus, Dr. Armour's opinion supports the ALJ's finding that plaintiff had no mental impairment.

In summary, the Court finds that substantial evidence in the record supports the ALJ's determination that plaintiff does not suffer from a mental impairment that would significantly impact his ability to perform work-related activities.

Plaintiff next argues that the ALJ failed to point to any medical evidence to support his determination that plaintiff could perform a full range of sedentary work. (Doc. #19, at 16). Specifically, plaintiff contends that "[n]one of the medical reports [in the record], with the exception of Dr. Tippett's one-time consultative exam, [indicates that plaintiff] would be capable of engaging in sustained full-time work activity." Id. at 18.

The ALJ noted that, on January 13, 2004, plaintiff's treating physician, Dr. Mannis, performed surgery on both of plaintiff's knees. (Tr. 15). The record indicates that, on February 25, 2004, Dr. Mannis opined that plaintiff could "work only in an essentially sedentary capacity, if available." (Tr. 212). Then, on March 31, 2004, Dr. Mannis determined that plaintiff needed to avoid repetitive squatting[,] bending and kneeling, but that he could return to work with the limitations. (Tr. 204).

The ALJ also cited the opinion of Dr. Johnston, an orthopedist, who examined plaintiff on June 15, 2004. (Tr. 197-99). The ALJ correctly noted that, although Dr. Johnston determined that plaintiff could have an undiagnosed neuromuscular problem, but "he 'did not find any specific pathology related to [plaintiff's] knees that would require evaluation or intervention at [that] time." (Tr. 15, 196, 199). The ALJ also considered Dr. Johnston's determination that plaintiff only suffered from a five percent (5%) partial impairment in his knees. (Tr. 15, 196).

The ALJ then considered the consultative opinion of Dr. Hanaway, the neurologist who examined plaintiff on August 24, 2004. (Tr. 15, 183-85). Dr. Hanaway determined that plaintiff had full range of motion of both knees, normal

motor functioning in the upper and lower extremities, and there was no tenderness around his heels. (Tr. 15, 184). Additional examinations also revealed that there was no sensory impairment to plaintiff's arms or legs. (Tr. 184).

The record indicates that the ALJ also considered the consultative opinion of Dr. Halstead, an orthopedist who examined plaintiff in January 2005. (Tr. 16). The ALJ correctly noted that Dr. Halstead opined that plaintiff had full range of motion of both knees without pain and good resistant strength. (Tr. 16, 153-54). After determining that plaintiff suffered from "bilateral pattellofemoral pain related to some chondromalacia as well as bilateral plantar fasciitis," Dr. Halstead recommended that plaintiff seek physical therapy to focus "diligently on stretches." (Tr. 16, 154).

Lastly, the ALJ cited a third, consultative orthopedic evaluation by Dr. Tippett, who examined plaintiff on August 29, 2006. (Tr. 16, 380-90). Although plaintiff's "knees [were] slightly puffy in appearance and mildly tender[,]" Dr. Tippett observed that plaintiff concluded that plaintiff's knees were stable with full range of motion. (Tr. 17, 381). According to the Medical Source Statement that Dr. Tippett completed, plaintiff was able to lift 25 pounds occasionally and 20 pounds frequently, stand and/or walk for about 6 hours in an 8-hour workday, perform unlimited sitting, and he exhibited limitations in his lower extremities. (Tr. 17, 385-86). Additionally, Dr. Tippett noted that plaintiff could climb, balance, kneel, crouch, crawl, and stoop, and that he exhibited no manipulative, visual, communicative, or environmental limitations. (Tr. 17, 386-88).

The grids provide that:

Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying

out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. 404.1567(a).  The Court finds that the ALJ cited ample medical evidence to support his conclusion that plaintiff could perform the full range of sedentary work, and plaintiff's limitations fall directly within the description of sedentary work.  Therefore, the Court concludes that substantial evidence in the record supports the ALJ's determination that plaintiff could perform a full range of sedentary work.

### 2.    The ALJ's Reliance on the Medical-Vocational Guidelines

Finally, plaintiff argues that the ALJ erred by relying on the grids, instead of obtaining the testimony of a vocational expert to establish that he was not disabled. (Doc. #19, at 18).

"An ALJ may rely on the grids to find a plaintiff not disabled[,] where the plaintiff does not have non-exertional impairments[,] or where the non-exertional impairment does not diminish the plaintiff's RFC to perform the full range of activities listed in the grids."  Washington v. Astrue, 2009 WL 3164080, at *8 (E.D. Mo. Sept. 29, 2009) (citing Muncy v. Apfel, 247 F.3d 728, 735 (8th Cir. 2001) (citing Holz v. Apfel, 191 F.3d 945, 947 (8th Cir. 1999)).  "However, when a claimant is  limited by a non-exertional impairment, such as pain or mental incapacity, the Commissioner may not rely on the [g]rids and must instead present testimony from a vocational expert to support a determination of no disability."  Washington v. Astrue, 2009 WL 3164080, at *8 (citing Gray v. Apfel, 192 F.3d 799, 802 (8th Cir. 1999)).

In his brief in support of his complaint, plaintiff claimed that his nonexertional impairments included pain, depression, and anxiety.  (Doc. #19).  The ALJ determined that plaintiff's non-exertional impairment of pain was only partially credible.  (Tr. 18-19).  Plaintiff's medical records support this finding.  The record indicates that, on

several occasions after performing plaintiff's knee surgery, Dr. Mannis opined that plaintiff exhibited full range of motion in both knees with some limitations. (Tr. 19, 204, 206, 208, 212, 216, 224). As stated above, the ALJ properly noted that the consultative physicians, who examined plaintiff, also "reached in a similar conclusions regarding the severity of [plaintiff]'s remaining knee-related limitations." (Tr. 19). Plaintiff received prescriptions to alleviate pain; however, the record shows that neither Dr. Mannis nor the consulting physicians opined that pain diminished plaintiff's capacity to perform work-related tasks. Moreover, as discussed above, the ALJ properly determined that plaintiff had no mental impairment that affected his ability to perform work-related functions. Thus, the record does not support plaintiff's contention that his nonexertional impairments included pain, depression, and anxiety.

After examining the entire record, the ALJ determined that plaintiff had the RFC to sit for six hours in an 8-hour workday, and to stand or walk for two hours in an 8-hour workday. (Tr. 22). Plaintiff could lift no more than 10 pounds. Id. The ALJ noted that plaintiff's exertional limitations coincided with the description of sedentary work as set forth in the grids. Additionally, the ALJ found that plaintiff's nonexertional limitations included occasional climbing, balancing, kneeling, crouching, crawling, and stooping. Id. The ALJ explained that plaintiff's nonexertional "limitation[s] would be of little significance in the broad world of sedentary/light work[, and that such] jobs . . . would not include duties" beyond plaintiff's exertional limitations. Id.

Based on the foregoing, the Court finds that the ALJ properly relied on the grids in determining that plaintiff was not disabled.

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole. Therefore, plaintiff is not entitled to relief.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in his complaint [Doc. #1] is **denied**.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 18th day of March, 2010.